Slip Op. No. 21-110

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **STAR PIPE PRODUCTS,** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | Before: Timothy C. Stanceu, Judge |
| Defendant, | Court No. 17-00236 |
| and | |
| **ANVIL INTERNATIONAL,** | |
| Defendant-Intervenor. | |

OPINION AND ORDER

[Remanding a decision issued in response to court order in litigation contesting an agency determination interpreting the scope of an antidumping duty order on certain cast iron pipe fittings]

Dated: August 26, 2021

*Francis J. Sailer*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiff. With him on the brief were *Ned H. Marshak* and *Kavita Mohan*.

*L. Misha Preheim*, Assistant Director, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and Joshua E. Kurland, Trial Attorney. Of counsel was *David W. Richardson*, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Daniel L. Schneiderman*, King & Spalding LLP, of Washington, D.C., for defendant-intervenor.  With him on the brief was *J. Michael Taylor*.

Stanceu, Judge:  Plaintiff Star Pipe Products ("Star Pipe") commenced this action to contest a decision of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") placing a group of imported products, certain "flanges" made of ductile cast iron, within the scope of an antidumping duty order.  Before the court is the Department's second determination issued in response to court remand (the "Second Remand Redetermination"), submitted to the court in response to the court's opinion and order in *Star Pipe Prods. v. United States*, 44 CIT __, 463 F. Supp. 3d 1366 (2020) ("*Star Pipe II*").  Concluding that Commerce reached certain findings that are unsupported by substantial evidence on the record considered as a whole and failed to address certain information detracting from its conclusion, the court remands the Second Remand Redetermination to Commerce for reconsideration.

## I. Background

Background is set forth in the court's prior opinions, which is summarized and supplemented herein.  *See id.* at __, 463 F. Supp. 3d at 1368–70; *Star Pipe Prods. v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1277, 1278–79 (2019) ("*Star Pipe I*").

### A. The Agency Decision Contested in this Litigation

The contested administrative decision is entitled *Final Scope Ruling on the Antidumping Duty Order on Non-Malleable Cast Iron Pipe Fittings from the People's Republic*

*of China: Request by Star Pipe Products* (Aug. 17, 2017) (P.R. Doc. 13) ("*Final Scope*

*Ruling*").  *See Notice of Scope Rulings*, 84 Fed. Reg. 9,295, 9,296 (Int'l Trade Admin.

Mar. 14, 2019).[1]

### B. Administrative Proceedings Culminating in the Issuance of the Order

Commerce issued the Final Scope Ruling in response to a request for a ruling (the

"Scope Ruling Request") that Star Pipe filed with Commerce on June 21, 2017, *Star Pipe*

*Products Scope Request: Ductile Iron Flanges* (P.R. Docs. 1–3) ("*Scope Ruling Request*"), to

seek a determination that certain flanges made of ductile iron that it imported from

China were outside the scope of an antidumping duty order (the "Order") Commerce

issued in 2003 on non-malleable cast iron pipe fittings from China.  *See Notice of*

*Antidumping Duty Order: Non-Malleable Cast Iron Pipe [Fittings] From the People's Republic*

*of China*, 68 Fed. Reg. 16,765 (Apr. 7, 2003) ("*Order*").  The Order resulted from an

antidumping duty petition (the "Petition") filed in 2002.  *See Petition for Imposition of*

*Antidumping Duties: Non-Malleable Cast Iron Pipe Fittings from the People's Republic of*

*China* (Feb. 21, 2002) (Rem. P.R. Docs. 30–32, Ex. 1) ("*Petition*").

---

[1] All citations to documents from the administrative record are to public
documents.  References cited as "P.R. Doc. __" are to documents that were on the record
in *Star Pipe Prods. v. United States*, 43 CIT __, 365 F. Supp. 3d 1277 (2019) ("*Star Pipe I*"),
while references cited as "Rem. P.R. Doc. __" and "Sec. Rem. P.R. Doc. __"are to
documents placed on the agency record during the Department's first and second
redetermination proceedings, respectively.

In response to the Petition, the U.S. International Trade Commission (the "ITC")

initiated its "injury or threat" investigation (Inv. No. 731-TA-990) in February 2002.

*Non-Malleable Cast Iron Pipe Fittings From China*, 67 Fed. Reg. 9,004 (Int'l Trade Comm.

Feb. 27, 2002).  Commerce published a notice (the "Initiation Notice") announcing its

parallel antidumping duty "less-than-fair-value" ("LTFV") investigation in March 2002.

*Notice of Initiation of Antidumping Duty Investigation: Non-Malleable Cast Iron Pipe Fittings*

*from the People's Republic of China*, 67 Fed. Reg. 12,966 (Mar. 20, 2002) ("*Initiation Notice*").

The ITC issued the preliminary results of its investigation in April of that year, *Non-*

*Malleable Cast Iron Pipe Fittings From China*, 67 Fed. Reg. 18,635 (Int'l Trade Comm.

Apr. 16, 2002), concluding "that there is a reasonable indication that an industry in the

United States is materially injured by reason of imports from China of non-malleable

cast iron pipe fittings . . . that are alleged to be sold in the United States at less than fair

value (LTFV)."

In September 2002, Commerce issued an affirmative preliminary determination

of sales at less than fair value, *Notice of Preliminary Determination of Sales at Less Than Fair*

*Value and Postponement of Final Determination: Non-Malleable Cast Iron Pipe Fittings From*

*the People's Republic of China*, 67 Fed. Reg. 60,214 (Sept. 25, 2002), and in early 2003

issued its final affirmative LTFV determination, *Notice of Final Determination of Sales at*

*Less Than Fair Value: Non-Malleable Cast Iron Pipe Fittings from the People's Republic of*

*China*, 68 Fed. Reg. 7,765 (Feb. 18, 2003).  The ITC reached a final affirmative "threat"

determination. *See Order*, 68 Fed. Reg. at 16,765 ("On March 24, 2003 . . . the

International Trade Commission (the ITC) notified the Department of Commerce (the

Department) of its final determination that the industry in the United States producing

non-malleable cast iron pipe fittings is threatened with material injury by reason of

import of the subject merchandise from the People's Republic of China (PRC)").

Issuance of the Order followed. *Id.*

### C. Proceedings Before the Court

Star Pipe commenced this action in 2017. Summons (Sept. 15, 2017), ECF No. 1;

Compl. (Sept. 15, 2017), ECF No. 4. Following the court's decision in *Star Pipe I*, which

resulted in an order to Commerce to reconsider the Final Scope Ruling, Commerce

placed new factual information on the record and invited interested parties to comment

and submit additional information. *See Antidumping Duty Order on Non-Malleable Cast*

*Iron Pipe Fittings from the People's Republic of China: Star Pipe Prod[u]cts Scope Remand*

*Redetermination* (May 9, 2019) (Rem. P.R. Doc. 25). The information Commerce added

included excerpts from the Petition. *See id.* at Attach. I. On May 20, 2019, Star Pipe and

defendant-intervenor, Anvil International, LLC ("Anvil"), submitted comments on the

new information and placed other new information on the record. *See Star Pipe's New*

*Factual Information in the Scope Inquiry on Non-Malleable Cast Iron Pipe Fittings from the*

*People's Republic of China* (May 20, 2019) (Rem. P.R. Docs. 30–32); *Non-Malleable Cast Iron*

*Pipe Fittings From The People's Republic Of China/Submission Of Factual Information* (May 20, 2019) (Rem. P.R. Doc. 33).

In its first redetermination upon remand (the "First Remand Redetermination"), Commerce again concluded that Star Pipe's ductile iron flanges are within the scope of the Order. *Final Results of Redetermination Pursuant to Ct. Order* 3–14 (June 27, 2019) (Rem. P.R. Doc. 39) ("*First Remand Redetermination*"). The court again ordered Commerce to reconsider its decision. *Star Pipe II*, 44 CIT at __, 463 F. Supp. 3d at 1379. In response, Commerce filed the instant Second Remand Redetermination on November 16, 2020. *Final Results of Redetermination Pursuant to Ct. Order* (Nov. 16, 2020) (Sec. Rem. P.R. Doc. 9) ("*Second Remand Redetermination*").

Anvil filed comments in support of the agency's decision. Def.-Inter.'s Comments on Commerce's Second Remand Redetermination (Jan. 8, 2021), ECF No. 83. Star Pipe filed comments in opposition. Star Pipe Prods.' Comments on Second Final Remand Redetermination (Jan. 8, 2021), ECF No. 84 ("Star Pipe's Comments"). Defendant filed a response to these comment submissions. Def.'s Resp. to Comments on the Second Remand Results (Feb. 10, 2021), ECF No. 87.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction according to 28 U.S.C. § 1581(c).[2]

If consistent with the court's remand order, the determinations, findings, and

conclusions in the Second Remand Redetermination will be upheld upon judicial

review unless they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

### B. Description of Star Pipe's Flanges

According to the Scope Ruling Request, "[t]he products that are the subject of

this scope request are flanges imported by Star Pipe that are made from ductile iron,

and meet the American Water Works Association ('AWWA') Standard C115." *Scope*

*Ruling Request* 3.  It added that "[a] flange is an iron casting used to modify a straight

end pipe to enable its connection either to a flanged pipe, a flanged pipe fitting or

another flange attached to the otherwise straight end of another pipe, in order to

connect pipes, valves, pumps and other equipment to form a piping system." *Id.*  The

Scope Ruling Request states that the flanges "are for the water and wastewater

industries."  *Id.* at 10; *see also id.* at 18 ("Star Pipe's ductile iron flanges are sold for use in

---

[2] All statutory citations herein are to the 2012 edition of the United States Code
and all regulatory citations herein are to the 2020 edition of the Code of Federal
Regulations.

water or waste waterworks projects. The majority of sales . . . are sold to fabricators to fabricate the products into flanged pipes.").

Each Star Pipe flange, which is disc-shaped, has in the thicker center portion (the "hub") a large hole with tapered thread allowing threading of the flange onto the end of a threaded pipe. *See id.*, Ex. 1. The outer, thinner portion of each flange is drilled with holes, either tapped or untapped, arranged in a circle for insertion of fasteners. *Id.* Photographs in the Scope Ruling Request illustrate how two pipes to which flanges have been assembled can be joined using bolts and nuts through the eight holes, with a gasket fitted between the two flanges to seal the joint. *Id.*, Ex. 8.

### C. The Scope Language of the Order

The Order addresses non-malleable cast iron pipe fittings in the first paragraph of the scope language, as follows:

> The products covered by this order are finished and unfinished non-malleable cast iron pipe fittings with an inside diameter ranging from 1/4 inch to 6 inches, whether threaded or unthreaded, regardless of industry or proprietary specifications. The subject fittings include elbows, ells, tees, crosses, and reducers as well as flanged fittings. These pipe fittings are also known as "cast iron pipe fittings" or "gray iron pipe fittings." These cast iron pipe fittings are normally produced to ASTM A-126 and ASME B.16.4 specifications and are threaded to ASME B1.20.1 specifications. Most building codes require that these products are Underwriters Laboratories (UL) certified. The scope does not include cast iron soil pipe fittings or grooved fittings or grooved couplings.

*Order*, 68 Fed. Reg. at 16,765. Star Pipe's flanges, which are made from ductile cast iron, and not from non-malleable cast iron ("gray iron"), are not described by this paragraph.

*See Star Pipe I*, 43 CIT at\_\_, 365 F. Supp. 3d at 1281.  The second paragraph addresses

ductile iron fittings, as follows:

> Fittings that are made out of ductile iron that have the same
> physical characteristics as the gray or cast iron fittings subject to the scope
> above or which have the same physical characteristics and are produced
> to ASME B.16.3, ASME B.16.4, or ASTM A-395 specifications, threaded to
> ASME B1.20.1 specifications and UL certified, regardless of metallurgical
> differences between gray and ductile iron, are also included in the scope
> of this petition.[3]  These ductile fittings do not include grooved fittings or
> grooved couplings.  Ductile cast iron fittings with mechanical joint ends
> (MJ), or push on ends (PO), or flanged ends and produced to American
> Water Works Association (AWWA) specifications AWWA C110 or
> AWWA C153 are not included.

*Order*, 68 Fed. Reg. at 16,765.

## D. The Court's Opinion and Order in *Star Pipe I*

In *Star Pipe I*, the court ruled that the Final Scope Ruling rested on an analysis

inconsistent with the Department's regulations.  Then, as now, the Department's

regulations required Commerce to "take into account . . . [t]he descriptions of the

merchandise contained in the petition, the initial investigation, and the determinations

of the Secretary [of Commerce] (including prior scope determinations) and the [U.S.

International Trade] Commission."  19 C.F.R. § 351.225(k)(1).  The court held that

Commerce failed to consider the merchandise descriptions in the Petition and,

---

[3] The court reiterates that "[t]he reference to 'this petition' appears to be incorrect
and probably should read 'this order.'"  *See Star Pipe I*, 43 CIT at \_\_, 365 F. Supp. 3d at
1281 n.4.

indicative of that failure, placed no part of the Petition on the record. *Star Pipe I*, 43 CIT

at __, 365 F. Supp. 3d at 1282 (citing 19 C.F.R. § 351.225(k)(1)).

Further, the court concluded that Commerce erred in relying upon certain

language in the injury determination of the U.S. International Trade Commission (the

"ITC Report") and made no mention of other, detracting evidence in the ITC Report. *Id.*

at __, 365 F. Supp. 3d at 1282; *see Scope Ruling Request* Ex. 7, Non-Malleable Cast Iron

Pipe Fittings From China, Inv. No. 731-TA-990 (Final), USITC Pub. No. 3586 (Mar. 2003)

(the "*ITC Report*"). The court reasoned that "[r]ead in the entirety, the ITC Report

contains evidence lending weight to a conclusion that Star Pipe's flanges are not subject

merchandise." *Star Pipe I*, 43 CIT at __, 365 F. Supp. 3d at 1286. That evidence included

language in the ITC Report indicating that the ITC considered all flanged fittings made

of ductile cast iron to be excluded from the scope of the ITC's investigation, which

suggested that ductile cast iron flanges also could have been considered to be outside

that scope. *Id.* at __, 365 F. Supp. 3d at 1285. The court opined, further, that "[t]he

absence of any mention of ductile iron flanges, as opposed to ductile flanged fittings, in

the ITC Report (and, according to plaintiff, in the petition) casts doubt on the premise

that ductile iron flanges were contemplated as part of either the scope of the

investigation or the scope of the domestic like product." *Id.* at __, 365 F. Supp. 3d at

1286.

The court also took issue with the Department's conclusion that Star Pipe's flanges were within the scope of a description of a "pipe fitting" in the ITC Report. *Id.* at __, 365 F. Supp. 3d at 1283. The ITC Report stated that "[p]ipe fittings generally are used to connect the bores of two or more pipes or tubes, connect a pipe to another apparatus, change the direction of fluid flow, or close a pipe." *ITC Report* 4. The court noted that the Final Scope Ruling did not address the previous sentence in the ITC Report, which at least suggested that the pipe fittings subject to the Order are those used in pipe fitting applications. *Star Pipe I*, 43 CIT at __, 365 F. Supp. 3d at 1283. The court pointed to record evidence, not addressed by Commerce in the Final Scope Ruling, that Star Pipe's flanges, in the form in which they were imported, were produced solely for the purpose of enabling pipe fabricators to modify a straight end pipe to add a flange enabling subsequent connection to a flange on another pipe or apparatus or to a flanged fitting. *Id.* at __, 365 F. Supp. 3d at 1284. The court identified record evidence, which Commerce also failed to mention in the Final Scope Ruling, that this modification is performed by pipe fabricators in a process that, according to an applicable industry standard, is required to be performed at the point of fabrication and not in the field. *Id.* at __, 365 F. Supp. 3d at 1284.

The court ordered Commerce to submit a redetermination that gives full and fair consideration to the merchandise descriptions in the Petition and to all relevant evidence contained in the ITC Report. *Id.* at __, 365 F. Supp. 3d at 1286.

### E. The First Remand Redetermination

In the First Remand Redetermination, Commerce again concluded that Star

Pipe's flanges are merchandise subject to the Order.  Commerce relied on information

included in exhibits to the Petition to conclude that the petitioners intended for flanges

to be within the scope of the term "pipe fittings" as used in the language they proposed

for the scope of the investigation and, therefore, within the scope of the term "pipe

fittings" (or "fittings") as used in the scope language of the Order.  *See First Remand*

*Redetermination* 5–7.

### F. The Court's Opinion and Order in *Star Pipe II*

In *Star Pipe II*, the court ruled that the First Remand Redetermination, "unlike the

Final Scope Ruling, considered all three sources of information that its regulation,

19 C.F.R. § 351.225(k)(1), required it to consider."  44 CIT at __, 463 F. Supp. 3d at 1379.

The opinion concluded, further, "that Commerce committed errors in analyzing the

evidence in one of those sources, the ITC Report" and that the First Remand

Redetermination "permissibly found certain evidentiary support for its determination

in the other two sources of information, the Petition and one of its own past scope

rulings, the UV Ruling."  *Id.* at __, 463 F. Supp. 3d at 1379; *see Final Scope Ruling on the*

*Antidumping Duty Order on Non-Malleable Cast Iron Pipe Fittings from the People's Republic*

*of China: Request by U.V. International LLC* (May 12, 2017) ("UV Ruling"), *appended to*

*Final Scope Ruling* as Attach. 1.

The court opined in *Star Pipe II* that brochures illustrating the products of the two petitioners, Anvil and Ward Manufacturing, Inc. ("Ward") and attached as exhibits to the Petition "are evidence that the petitioners considered 'flanges' to be pipe fittings, and nothing in the Petition expressly excludes flanges from the proposed scope of the investigation." 44 CIT at __, 463 F. Supp. 3d at 1373.

The court concluded that Commerce, while permissibly finding support for its conclusion in the UV Ruling, erred in relying on two other past rulings, the "Taco Ruling" and the "Napac Ruling." *Id.* at __, 463 F. Supp. 3d at 1376–77; *see Final Scope Ruling on the Antidumping Duty Order on Finished and Unfinished Non-Malleable Cast Iron Pipe Fittings from the People's Republic of China: Request by Napac for Flanged Fittings* (Sept. 19, 2016) ("*Napac Ruling*"); *Final Scope Ruling on the Black Cast Iron Flange, Green Ductile Flange, and the Twin Tee* (Sept. 19, 2008) ("*Taco Ruling*"), *appended to Final Scope Ruling* as Attach. 2, and 4, respectively. As it had in *Star Pipe I*, the court noted that the products at issue in the Taco Ruling were flanged fittings, a product Commerce itself considered distinct from flanges, that some of the products at issue in the Napac Ruling also were flanged fittings, and that the court was unable to conclude from the Napac Ruling that the remaining products were identical to Star Pipe's flanges. *Star Pipe II*, 44 CIT at __, 463 F. Supp. 3d at 1376.

In ordering Commerce to reach a new decision, the court instructed that "the new decision must recognize that the ITC Report does not contain evidence supporting

a conclusion that Star Pipe's flanges are within the scope of the Order and contains

some evidence that detracts from such a conclusion." *Id.* at __, 463 F. Supp. 3d at 1379.

The opinion added that "[a]t this point in the litigation, the court declines to decide the

question of whether or not the record evidence Commerce found in the Petition and the

UV Ruling is sufficient to support such a conclusion in light of all record evidence,

including the record evidence detracting from such a conclusion," and, "[u]pon

correcting the errors the court identifies, Commerce must make that determination in

the first instance." *Id.* at __, 463 F. Supp. 3d at 1379.

### G. The Second Remand Redetermination

In the Second Remand Redetermination, Commerce again determined that Star

Pipe's flanges were subject merchandise.  Commerce based its decision that Star Pipe's

flanges are within the scope of the Order on the following principal conclusions: (1) the

Petition contains evidence supporting a finding that the petitioners considered flanges

to be "pipe fittings" for purposes of the proposed antidumping duty investigation

culminating in the Order; (2) Star Pipe's flanges meet the technical specifications of the

scope language for pipe fittings made of ductile iron because they have the same

physical characteristics as the non-malleable pipe fittings the Order expressly includes;

(3) the ITC Report does not contain contrary evidence sufficient to alter the

Department's conclusion; and (4) the claimed conformance of Star Pipe's flanges with

AWWA specification C115 does not place Star Pipe's flanges outside of the Order.

*Second Remand Redetermination* 4–24.  On the last finding, Commerce determined that

the exclusion in the scope language applies only to flanged fittings (and not flanges)

produced to AWWA specification C110 or C153, to which, according to Commerce,

AWWA C115 has not been shown to be equivalent, and because the exclusion was

drafted to effectuate the intent of the petitioners that goods such as Star Pipe's flanges

would not be excluded from the scope of the proposed investigation.  *Id.* at 20–24.

### H. Methodology for Scope Determinations

According to the Department's regulations, "in considering whether a particular

product is included within the scope of an order . . . the Secretary [of Commerce] will

take into account the following: (1) the descriptions of the merchandise contained in the

petition, the initial investigation, and the determinations of the Secretary (including

prior scope determinations) and the [International Trade] Commission."  19 C.F.R.

§ 351.225(k)(1).[4]  The provision is not written so as to identify the *only* sources of

information Commerce is permitted to consider.  The Department's inquiry must center

on the scope language of the antidumping or countervailing duty order, for the

Department's role in issuing a scope ruling is to interpret, not modify, the scope

---

[4] If the "criteria" of § 351.225(k)(1) "are not dispositive, the Secretary will further consider: (i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).  Star Pipe argued previously in this litigation that Commerce should have considered the (k)(2) sources but has not preserved that argument in its comments on the Second Remand Redetermination.

language.  *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1095 (Fed. Cir. 2002)

("Commerce cannot interpret an antidumping order so as to change the scope of that

order, nor can Commerce interpret an order in a manner contrary to its terms." (internal

quotation marks and citation omitted)).  Moreover, to be sustained upon judicial

review, the determination must be supported by the record evidence considered on the

whole.  As a practical matter, this must include consideration of the record information

contained in the scope ruling request, which ordinarily will include, *inter alia*,

"[a] detailed description of the product, including its technical characteristics and uses."

19 C.F.R. § 351.225(c)(1)(i).

### I. Certain Findings in the Second Remand Redetermination Are Not Supported by Substantial Evidence on the Record Considered on the Whole, which Also Contains Certain Evidence Detracting from the Department's Determination

#### 1. The Meaning of the Term "Pipe Fittings" as Used in the Scope Language

The scope language of the Order does not define the term "pipe fittings" (or the

term "fittings," used synonymously in the scope language).  Commerce looked to the

criteria of 19 C.F.R. § 351.225(k)(1) for guidance on interpreting these terms.

In response to the court's rulings in *Star Pipe I* and *Star Pipe II*, Commerce, under

protest, disclaimed in the Second Remand Redetermination any reliance on the

aforementioned description in the ITC Report.  *Second Remand Redetermination* 9.  The

ITC Report's description is not written as a definition of the term "pipe fitting," but

instead is a general identification of the uses of pipe fittings in piping systems.  As the

court explained in *Star Pipe I*, Commerce reached a conclusion, unsupported by the

record evidence, that Star Pipe's flanges necessarily would answer to that description.

43 CIT at __, 365 F. Supp. 3d at 1284–86.

    In contrast, the Petition contains some evidence, consisting of the product

brochures of Anvil and Ward, supporting a finding that, as a general matter, flanges

used in piping systems are described by the term "pipe fitting" or "fitting."  More

specifically, this evidence lends support to a finding that Anvil and Ward, who were

producers of pipe fittings and the two petitioners in the investigation, *considered* flanges,

in general, to be pipe fittings.  *See Star Pipe II*, 44 CIT at __, 463 F. Supp. 3d at 1373; *see*

*also Second Remand Redetermination* 9 ("The inclusion of flanges in the product

catalogues indicates that the petitioners considered flanges to be pipe fittings, as a type

of product that is similar to and is produced by the same industry as other subject pipe

fittings.").  Because the scope of an antidumping duty investigation is substantially

influenced by the investigative scope proposed in the petition, it was reasonable for

Commerce to accord weight to this evidence in interpreting the meaning of the term

"pipe fittings" in the scope language.  Moreover, interpreting this term as used in the

scope language as generally encompassing flanges is not *per se* unreasonable.[5]

---

[5] A pipe fitting has been defined as "a piece (such as a coupling or elbow) used to
connect pipes or as accessory to a pipe."  Pipe Fitting, Merriam-Webster,
https://www.merriam-webster.com/dictionary/pipefitting (last visited Aug. 24, 2021).

Nevertheless, the fact that flanges are listed in the Anvil and Ward brochures, standing alone, is not determinative of whether the scope language to be interpreted includes flanges in general, or the particular flanges at issue here. The scope language, like the text of the Petition, makes no mention of flanges. The list of exemplars ("elbows, ells, tees, crosses, and reducers as well as flanged fittings"), while not exhaustive, expressly mentions flanged fittings but not flanges. *See Order*, 68 Fed. Reg. at 16,765; *Petition* 3. Also, the "flanged fittings" reference differs from the other exemplars in referring to the method of attachment of a fitting to another good. It encompasses products mentioned in the other exemplars. *See, e.g., Petition* Ex. 2 (illustrating two examples of flanged elbows that are threaded on one end and flanged on the other). In doing so, the language poses the question of why a good with a defining physical characteristic in common with a flanged fitting, i.e., a flange to allow attachment to other goods with flanges, was not also mentioned in the exemplars. This is not to conclude that the scope language, when read according to plain meaning, *must* be interpreted to exclude flanges; rather, it is to recognize that the scope language by itself does not resolve the issue, and Commerce, therefore, is required to examine the other relevant evidence on the record. As discussed later in this Opinion and Order, the record contains, for example, evidence that the type of flange at issue in this case, which is a threaded flange produced for attachment to a threaded pipe produced for the water works industry, is *not* considered to be a pipe fitting by the AWWA standards that

apply to products produced for that industry.  The Second Remand Redetermination does not indicate that Commerce considered this record evidence.

### 2. The Exclusion for Certain Ductile Iron Fittings Produced to AWWA Standards

The scope language of the Order contains this exclusion: "Ductile cast iron fittings with mechanical joint ends (MJ), or push on ends (PO), or flanged ends and produced to the American Water Works Association (AWWA) specifications AWWA C110 or AWWA C153 are not included." *Order*, 68 Fed. Reg. at 16,765.  In the Second Remand Redetermination, Commerce determined that this exclusion did not apply to any of Star Pipe's flanges. *Second Remand Redetermination* 17–18.  Commerce reached this determination based on a series of specific findings.  Upon examining record evidence in the Petition, the Scope Ruling Request, and the ITC Report, the court concludes that certain of these findings are not supported by substantial evidence on the record.

The Petition proposed an investigation with a scope it described as follows:

> The scope of this petition covers finished and unfinished non-malleable cast iron pipe fittings (including ductile fittings) with an inside diameter ranging from 1/4 inch to 6 inches whether threaded or un-threaded, regardless of industry or proprietary specification, used in, or intended for use in, non-malleable cast iron pipe fittings applications described in subsection 2 below.

*Petition* 3.  "Subsection 2" stated, in pertinent part, that:

> Virtually all subject fittings are used in fire protection systems and in the steam heat conveyance systems used in old inner cities.  The fire protection/sprinkler market is by far the dominant use, accounting for

approximately 90 percent of shipments.  The steam heating market
represents another 5 percent of shipments, with other uses constituting
less than 5 percent of shipments.

*Id.* at 4.  It is possible to interpret the term "applications described in subsection 2

below" as intended to encompass unnamed "other uses constituting less than 5 percent

of shipments" as well as the named applications, i.e., fire protection sprinkler and steam

heating systems, but this interpretation leads to a textual problem.  If the Petition is

interpreted in that way, then the words "used in, or intended for use in" as they appear

in the first paragraph do not limit the proposed scope of the investigation being sought

and therefore can have no meaning.  This textual problem is avoided if the reference in

the first paragraph to "applications described in subsection 2 below" is limited to

applications that actually are *described* there, as opposed to merely referenced there.  At

best, the Petition is ambiguous, the petitioners not having elaborated on the "other uses

constituting less than 5 percent."  Commerce found, nevertheless, that "flanges used in

water and wastewater systems may fall under the category of other uses, or non-

traditional non-malleable pipe fitting applications."  *Second Remand Redetermination* 16.

This finding is entirely speculative, being based on no record evidence.

The Department's Initiation Notice, published in the Federal Register on

March 20, 2002, described the scope of the antidumping duty investigation using

language essentially identical to what would become the scope language in the Order.

*See Initiation Notice*, 67 Fed. Reg 12,966.  In proposing a scope for the investigation, the

Petition did not propose an exclusion from the investigation for any product made to

standards for the water works industry.  The Second Remand Redetermination

recognizes this point.  *Second Remand Redetermination* 49 ("The petitioners did not seek

to exclude products made to any AWWA standard in the instant pipe fittings

investigation." (footnote omitted)).

Paradoxically, Commerce nevertheless concluded in the Second Remand

Redetermination that the "narrow" scope of the AWWA exclusion effectuated the intent

of the petitioners, even though the Petition proposed no exclusion for products made to

AWWA standards.  *Id.* at 48–49.  The record evidence does not support the

Department's conclusion.  Commerce explained that "[a]bsent a concern that a

proposed scope cannot be effectively administered, that there is a potential for evasion

or circumvention without amendment, or that the scope language is inconsistent with

the intent of the petitioner or industry support, Commerce generally will accept the

scope as defined in the petition."  *Id.* (citing two of the Department's decisions in an

unrelated proceeding).  Commerce did not invoke any of the three exceptions it noted,

but still it reiterated its deference to the petitioners' intent: "[T]he fact that the scope of

the *Order* specifies only two excluded AWWA standards indicates that Commerce

allowed a narrow exclusion, consistent with Commerce's practice to defer to the intent

of the petitioner in fulfilling its statutory mandate to provide, where appropriate, the

relief requested by the petitioning industry."  *Id.* at 49 (citing two decisions in another

unrelated proceeding).  Commerce added that "[t]his practice ensures that the scope

both includes the specific products for which the petitioner has requested relief and

excludes those products that would otherwise fall within the general scope physical

description, but for which the petitioner does not seek relief."  *Id.* (citing two past

decisions of Commerce in other proceedings).

The Petition, in stating that "[v]irtually all subject fittings are used in fire

protection systems and in the steam heat conveyance systems used in old inner cities,"

is at least a suggestion that goods produced to standards for the water works industry

were intended to be outside the scope of the investigation.  *See Petition* 4.  It is possible

that the Department's intent was to distinguish goods produced for that industry from

subject merchandise by requiring the excluded products to be produced to AWWA

standards.  But contrary to the rationale Commerce put forward, there is no suggestion

in the Petition of an intent on the part of the two petitioners, Anvil and Ward, that some

ductile iron products made to AWWA standards for the water works industry would be

within the proposed scope of the investigation and others would not.  Nor is there any

indication in the *text* of the Petition that the two petitioners contemplated that flanges

would be within the scope of the proposed investigation.  And while the brochures are

evidence that the petitioners generally considered flanges to be pipe fittings, there is no

indication, in either the text of the Petition or the exhibits, that the petitioners

specifically intended for ductile iron flanges, or in particular those such as Star Pipe's—

which Star Pipe described as threaded flanges produced for the water works industry—

to be within the scope of their proposed investigation.

In summary, the Petition contains evidence that the two petitioners considered

flanges, in general, to be within the scope of the term "pipe fittings," but the evidence in

the Petition is not dispositive of the specific issue presented by this litigation.  As

discussed above, Commerce permissibly considered that evidence from the petition as

supporting its decision to include Star Pipe's flanges within the scope of the Order.

Commerce erred as to another finding it reached from the evidence in the Petition when

it concluded that its interpretation of the "narrow" scope of the AWWA exclusion

effectuated the intent of the petitioners.  Commerce fails to point to any evidence in the

Petition that supports this finding.

### 3. Relevant Evidence in the ITC Report

As mentioned previously, the scope of the investigation as Commerce defined it

in the Initiation Notice, published on March 20, 2002, is essentially identical to the scope

language of the Order, issued on April 7, 2003.  The issuance of the ITC Report (which

stated the final results of the ITC's investigation) occurred in the interim.  Therefore, it

could not have resulted in any change by Commerce in the scope language Commerce

inserted into the Order at the conclusion of the investigations by Commerce and the

ITC.

As the court concluded in *Star Pipe I*, the ITC Report contains certain evidence detracting from the Department's conclusion that Star Pipe's flanges are subject merchandise.  43 CIT at __, 365 F. Supp. 3d at 1285.  The court identified language in the ITC Report indicating that the ITC considered all flanged fittings made of ductile cast iron to be excluded from the scope of the ITC's investigation, which suggested that ductile iron flanges also were considered by the ITC to be outside that scope.  *Id.* at __, 365 F. Supp. 3d at 1285.

In the Second Remand Redetermination, Commerce concluded that "the ITC specifically investigated ductile iron pipe fittings and did not exclude ductile iron flanges from its material injury investigation."  *Second Remand Redetermination* 44.  While the conclusion that the ITC investigated ductile iron pipe fittings is supported by the ITC Report, the conclusion that the ITC did not exclude ductile iron flanges from its material injury investigation is speculative and misleading: there is no evidence in the ITC Report that the ITC considered flanges, which the ITC did not discuss, to be merchandise within the scope of its investigation.  Moreover, Commerce fails to analyze the evidence that the ITC defined the domestic like product as corresponding to the scope of the investigation and, at the same time, declined to broaden the domestic like product to include any ductile flanged fittings:

> Domestic producers did not report domestic production of ductile flanged fittings that would otherwise correspond to merchandise within the scope.  Accordingly, there is no data on domestic ductile flanged fittings that could be included in any broadened like product analysis.

> Any issue regarding possible broadening of the domestic like product to
> include ductile flanged fittings is therefore moot.

*ITC Report* 7–8 (internal citation omitted).  The ITC left no doubt that it defined the

scope of the domestic like product as corresponding to the scope of its injury and threat

investigation.  *Id.* at 8 ("For the reasons stated above, we find the domestic product to be

non-malleable and ductile cast iron pipe fittings corresponding to the scope.").  Even

though the ITC Report recognized that the scope as defined by Commerce contained a

specific exclusion that covered ductile flanged fittings made to AWWA specifications

C110 and C153, *see id*. at 4, the ITC's method of defining the scope of its own

investigation is probative evidence on the issue of ductile iron flanges that Commerce

was not free to ignore.  This evidence strongly supports the view that the ITC excluded

ductile flanged fittings from the unfairly traded imports that it found to threaten to

injure the domestic industry.[6]  Ductile iron flanges are shown by the record evidence to

share a defining physical characteristic with ductile flanged fittings, i.e., the presence of

---

[6] Commerce may impose antidumping duties on a good only following a
determination by Commerce that the good is "unfairly traded," i.e., that it was the
subject of an affirmative less-than-fair-value determination by Commerce and also was
included within the goods investigated by the ITC and thereby found to have resulted
in material injury or the threat of material injury to the domestic industry.  *See* 19 U.S.C.
§ 1673.  By including "the descriptions of the merchandise contained in . . .
the determinations of . . . the Commission" among the sources of information Commerce is
to consider in ruling on a scope issue, 19 C.F.R. § 351.225(k)(1), the Department's
regulations embody this principle.

a flange as a means of attachment to another article. That the ITC did not discuss

flanges in discussing the subject merchandise is also apparent from this record.

The Second Remand Redetermination states, further, that "we find it reasonable

to conclude that the ITC, which initiated its material injury investigation of non-

malleable cast iron and ductile iron pipe fittings in response to the domestic industry's

request for relief, would be aware during the course of the investigation that the

petitioners produced flanges and considered those products to be pipe fittings." *Second

Remand Redetermination* 44. This conclusion is speculative and unsupported by the ITC

Report. While the Petition attached brochures that included flanges, the text of the

Petition, like the ITC Report, did not discuss them.

Certain other evidence in the ITC Report is also relevant to the issues presented

by this litigation. The staff report portion of the ITC Report states that "[t]he ductile

fittings used in the waterworks applications are typically very large and are reportedly

produced in the United States primarily by a handful of foundries, none of which

produces non-malleable cast iron pipe fittings." *ITC Report* I-7 (footnote omitted). The

document also states:

> As discussed earlier in this report, ductile fittings which are
> manufactured to the physical specifications for waterworks systems are
> distinguishable in physical characteristics from the domestic like product
> in that they are typically very large fittings which must meet different
> technical specifications. These fittings are used underground in the water
> distribution and transmission systems, above ground in water treatment
> plants, or for main water supply to buildings, and are meant for drinking
> water and waste water. These fittings are typically made to the American

> Water Works Association specifications and their end uses include water
> companies, municipal water systems, and water/waste water treatment
> plants.

*Id.* at I-9 (footnote omitted).  This language from the staff report, which was before the

Commission when it made its affirmative threat determination, suggests that the ITC

may have considered ductile iron goods produced to AWWA standards for water

supply and waste water applications to be excluded from the domestic like product.  In

the Second Remand Redetermination, Commerce focused on the ITC Report's statement

that "[f]ittings larger than six inches in inside diameter typically are made to

specifications of the AWWA and often are used in waterworks applications," *Second

Remand Redetermination* 50 (quoting *ITC Report* 7), but the use of the word "typically" in

the quoted sentence from the ITC Report and in the above-quoted language of the staff

report section of the ITC Report, *ITC Report* I-9, introduces ambiguity as to whether the

reference in the staff report section of the ITC Report possibly could be referring to all

ductile iron fittings produced to AWWA standards for the water works industry.  This

evidence must be considered in light of the aforementioned record evidence indicating

that the ITC—in the section setting forth the actual views of the Commission as

opposed to the section from the staff report—considered *all* ductile iron flanged fittings

to be outside the scope of the ITC's investigation.

### 4. The Relationship Between AWWA C115 and AWWA C110

Commerce reached certain findings pertaining to AWWA C110 and C115 that are

not supported by substantial evidence on the record of this proceeding.  Commerce

found that "the AWWA C115 specification that Star Pipe put on the record does not

support Star Pipe's assertion that AWWA C115 is equivalent to AWWA C110." *Second*

*Remand Redetermination* 21.  Commerce followed with a finding that "[t]his specification

information only indicates that *flanged pipe* (a flange assembled onto a pipe) produced to

AWWA C115 may be used with products produced to AWWA C110." *Id.* (citing *Scope*

*Ruling Request* Exs. 3 [excerpts from AWWA C115] & 4 [excerpts from AWWA C110]).

The record evidence does not support either of these findings.

According to uncontradicted evidence Star Pipe placed on the record with its

Scope Ruling Request, flanges conforming to AWWA C115 necessarily must be

produced to "conform to the respective chemical and physical properties for gray-iron

and ductile-iron fittings, according to ANSI/AWWA C110/A21.10 [AWWA C110]."

*Scope Ruling Request* Ex. 3 at Sec. 4.3.3.  Second, it is not true that AWWA C115 "only

indicates that *flanged pipe* (a flange assembled onto a pipe) produced to AWWA C115

may be used with products produced to AWWA C110." *See Second Remand*

*Redetermination* 21.  According to the record evidence, AWWA C115 indicates much

more than that, including, in particular, the aforementioned specification that flanges

produced to C115 must comply with the chemical and physical properties that C110

specifies for fittings. It also demonstrates that C110 and C115 are closely interrelated and cross-reference each other. And both demonstrate that for purposes of these two standards, threaded flanges produced for attachment to threaded pipe produced for the industry served by these ANSI/AWWA standards comprise a class of products distinct from the products these standards identify as "pipe fittings." The court addresses these issues in further detail below.

Exhibits to the Scope Ruling Request include pertinent information on the intended scope and historical development of AWWA Standards C110, C153 (the AWWA standards mentioned in the exclusion), and C115, which according to record evidence is formally known as "ANSI/AWWA C115/A21.15-75, Standard for Flanged Cast-Iron and Ductile-Iron Pipe With Threaded Flanges." *Scope Ruling Request* Exs. 3, 4 at xi. The record evidence pertaining to ANSI/AWWA C115/A21.15-75 provides the following explanatory material on the need for the adoption of that industry standard:

> I.B. *History.* Flanged fittings, sizes 3 in. through 48 in. (80 mm through 1,200 mm), are described in ANSI/AWWA C110/A21.10, Standard for Ductile-Iron and Gray-Iron Fittings. Flanged fittings, sizes 54 in. through 64 in. (1,400 mm through 1,600 mm), are covered in ANSI/AWWA C153/A21.53, Standard for Ductile-Iron Compact Fittings. The flanged pipe used with these fittings has been purchased for many years in accordance with users', manufacturers', and fabricators' standards. An ANSI/AWWA standard was needed for flanged pipe. Consequently, Subcommittee 1 submitted a proposed standard for flanged pipe to Committee A21 in 1974. The first edition of the standard was adopted in 1975.

*Id.*, Ex. 3 at ix.  ANSI/AWWA C115/A21.15-75 applies to "flanged pipe," not "fittings,"

and, in Section 4.3.3 contains physical and chemical specifications for the threaded

flanges that are produced for attachment to threaded pipes:

> 4.3.3 *Material properties*.  Unless otherwise specified by the
> purchaser, solid flanges may be cast of either ductile iron or gray iron.
> Hollow-back flanges shall be ductile iron only.  *Flanges shall conform to the*
> *respective chemical and physical properties for gray-iron and ductile-iron fittings,*
> *according to ANSI/AWWA C110/A21.10.*

*Id.*, Ex. 3 at Sec. 4.3.3 (emphasis added).  The text of Section 4.3.3 of ANSI/AWWA

C115/A21.15-75 emphasized above is significant for this litigation in two respects.  First,

it is evidence that the developers of the ANSI/AWWA standards for the pipe fittings,

flanged pipe, and flanges produced for the water works industry considered threaded

flanges produced for attachment to threaded pipe to be a different class or kind of

merchandise than the pipe "fittings" produced for that industry.  That much is

indicated by the fact that different AWWA standards were made to apply to each of

these two classes or kinds, and it is further indicated by the sentence, "[*f*]*langes* shall

conform to the respective . . . properties for . . . *fittings*."  *Id.* (emphasis added).  This

sentence would be nonsensical if flanges were "fittings" for purposes of the AWWA

standards.  Instead, the ANSI/AWWA standards group the threaded flanges with

threaded pipe, not with fittings.  Second, the promulgators of the ANSI/AWWA

standards expressly required that flanges produced for attachment to threaded pipes

would conform to the chemical and physical specifications their standards prescribed

for fittings, with a specific reference to the specifications of ANSI/AWWA C110/A21.10.

Star Pipe argues that ". . . AWWA C115 is a complementary standard to AWWA C110

and C153; the only difference is that C115 covers flanges while C110 and C153 are for

flanged fittings." Star Pipe's Comments 22 (quoting *Scope Ruling Request* 3, Ex. 3

(AWWA C115)). Section 4.3.3 of ANSI/AWWA C115/A21.15-75 is evidence supporting

Star Pipe's contention.

The close interrelationship between ANSI/AWWA C115/A21.15-75 (flanged pipe)

and ANSI/AWWA C110/A21.10 (fittings) is further demonstrated by a 1977 change to

the latter to achieve conformity with the former:

> Another change made in the 1977 edition [to ANSI/AWWA
> C110/A21.10] was in bolt lengths for flanged fittings to comply with
> ANSI/AWWA C115/A21.15-75, Standard for Flanged Cast-Iron and
> Ductile-Iron Pipe With Threaded Flanges. Appendix A was added to the
> standard to cover bolts, gaskets, and the installation of flanged fittings.

*Scope Ruling Request* Ex. 4 at xi. In summary, the materials attached to the Scope Ruling

Request pertaining to ANSI/AWWA C110/A21.10 and ANSI/AWWA C115/A21.15-75

are evidence supporting findings that: (1) threaded flanges to be attached to threaded

pipes for water works applications are considered by the ANSI/AWWA standards to be

a different class or kind of goods than "fittings," and (2) flanges and fittings for the

industry served by the AWWA standards, and produced to the specifications in those

standards, are required to be produced so as to have the same "chemical and physical

properties," *id.*, Ex. 3 at Sec. 4.3.3.

Thus, even if "flanges" in general may fall within some definitions of the term

"pipe fittings," that alone does not foreclose a finding that some or all of Star Pipe's

flanges are within a class or kind of goods that, based on the evidence in the Petition,

the ITC Report, and the Scope Ruling Request (which includes record evidence on the

ANSI/AWWA standards for the water works industry), qualify for the exclusion for

certain ductile pipe fittings in the second paragraph of the scope language.  In the

Second Remand Redetermination, Commerce reasoned that Star Pipe's articles cannot

qualify for this exclusion because, although they are flanges and although they are

fittings, they are not flanged fittings. *Second Remand Redetermination* 20–22.  This

reasoning overlooks the plain fact that Commerce itself drafted the exclusion in terms of

AWWA standards.  Having done so, Commerce must be presumed to have been

familiar with those standards, including, in particular, the distinction the AWWA

standards draw between threaded "flanges" used to manufacture flanged pipe,

addressed by AWWA C115, and the "fittings" addressed by AWWA C110.  As a result,

Commerce did not address or explain the contradiction underlying its conclusion:

Commerce placed Star Pipe's flanges under the Order because it considered these goods

to be pipe fittings (but not flanged pipe fittings) and because, according to Commerce,

Star Pipe's products are not produced to AWWA specifications C110 or C153—

specifications according to which Star Pipe's flanges are *not* pipe fittings.  Commerce

also failed to address the uncontradicted record evidence that flanges produced to

ANSI/AWWA C115/A21.15-75 must conform to the chemical and physical properties

required by ANSI/AWWA C110/A21.10.

Certain other record evidence in addition to the record evidence the court

identified above also is relevant to the issue of whether some or all of Star Pipe's flanges

qualify for the AWWA exception in the second paragraph of the scope language.  For

example, according to the exhibits attached to the Scope Ruling Request, ANSI/AWWA

C110/A21.10, Standard for Ductile Iron and Gray-Iron Fittings, i.e., AWWA C110, which

applies only to pipe fittings, is limited to fittings with mechanical joint ("MJ") ends or

flanged ends.  *Scope Ruling Request* Ex. 4 at xi (explaining that as a result of a 1977

revision that limited the scope, the standard (which until that revision applied to

fittings 2 inches in nominal diameter) "included 3- to 48-in. (80- to 1,200-mm)

*mechanical-joint and flanged fittings only*" (emphasis added)), *see also id.*, Ex. 3 at ix.[7]  Thus,

according to uncontradicted record evidence, *all* ductile iron fittings produced to

AWWA C110 are, necessarily, described by the AWWA scope exclusion.  As to AWWA

C110, the scope language providing the exclusion for certain ductile iron fittings has

language requiring MJ, push-on, or flanged ends that appears to be superfluous, and

with respect to the AWWA standards the scope exclusion is broader than it might seem

at first glance.  This evidence, too, must be considered in light of record evidence that

---

[7] The copyright date for AWWA C110 and AWWA C115, as present on the record, is 2012 and 2011, respectively.

the ITC considered all ductile flanged fittings to be outside the scope of the domestic

like product, which the ITC defined as corresponding to the scope of its investigation.

### J. Record Evidence that Not All of Star Pipe's Flanges Were Produced to AWWA Standard C115

ANSI/AWWA C115/A21.15-75, Standard for Flanged Cast-Iron and Ductile-Iron

Pipe With Threaded Flanges, i.e., AWWA C115, which the evidence shows is closely

interrelated with AWWA C110, parallels the 3-inch nominal minimum size specification

for fittings by applying only to threaded pipes that are 3 inches or larger in nominal

pipe size. *Scope Ruling Request* Ex. 3 at Sec. 4.3.1 ("Flanges shall conform to the

dimensions shown in Table 2 [listing solid gray-iron or ductile-iron flanges for nominal

pipe sizes of 3 inches through 64 inches] or [Table] 3 [listing hollow-back flanges, which

must be of ductile-iron, for nominal pipe sizes of 3 inches through 36 inches]").[8]

The Scope Ruling Request, in Exhibit 1, sought a scope ruling on 11 models of

flanges. Two of the eleven models are produced for threaded pipes with outer

diameters of 2.5 inches (2 inches in "nominal size"). *Id.*, Ex. 1. The other 9 are produced

for threaded pipes of 3.96 inches or 4.8 inches in outer diameter. *See id.* Star Pipe stated

in the Scope Ruling Request that "[t]he products that are the subject of this scope

request . . . meet the American Water Works Association ('AWWA') Standard C115," *id.*

---

[8] Ductile flanged fittings of 54 inches through 64 inches are addressed in ANSI/AWWA C153/A21.53, Standard for Ductile Iron Compact Fittings. *See Star Pipe Products Scope Request: Ductile Iron Flanges* Ex. 3 at ix (June 21, 2017) (P.R. Docs. 1–3).

at 3, but as to the flanges produced for pipes of 2.5 inches in outer diameter, there is

record evidence that appears to contradict this statement.

### III. CONCLUSION AND ORDER

In summary, Commerce did not consider all relevant record evidence—and as

the court mentioned, reached some findings that are unsupported by record evidence—

in concluding that Star Pipe's flanges are within the scope of the Order.

The court concludes that it must remand to Commerce the decision the agency

reached in the Second Remand Redetermination. Certain material findings and

conclusions Commerce reached in the Second Remand Redetermination, as identified in

this Opinion and Order, are not supported by substantial evidence. Moreover,

Commerce failed to address, or address in any meaningful way, certain evidence on the

record that detracts from its ultimate conclusion. For example, Commerce did not

confront the implications of the evidence in the ITC Report that the ITC considered all

ductile flanged fittings to be outside the scope of its own investigation and its domestic

like product. With respect to the AWWA exclusion in the second paragraph of the

scope language, Commerce failed to address or resolve the problem for its analysis that

is posed by: (1) record evidence demonstrating that threaded flanges produced to

AWWA standards applicable to goods produced for the waterworks industry are not

"pipe fittings" or "fittings" within the meaning of those standards, and (2) evidence that

flanges produced to AWWA standard C115 "shall conform to the respective chemical

and physical properties for gray-iron and ductile-iron fittings, according to

ANSI/AWWA C110/A21.10."  *Scope Ruling Request* Ex. 3 at Sec. 4.3.3.

The court does not reach its own conclusion as to whether some or all of Star

Pipe's flanges must be determined to be within or outside the scope of the Order, as that

is a matter for Commerce to determine upon remand.  The court rules instead that

Commerce must conduct a more comprehensive review of the relevant record evidence

that remedies the shortcomings the court has identified.  Therefore, upon consideration

of the Second Remand Redetermination and all papers and proceedings had herein, and

upon due deliberation, it is hereby

**ORDERED** that Commerce, within 90 days from the date of issuance of this
Opinion and Order, shall submit a new redetermination upon remand ("Third Remand
Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that plaintiff and defendant-intervenor shall have 30 days from the
filing of the Third Remand Redetermination in which to submit comments to the court;
and it is further

**ORDERED** that defendant shall have 15 days from the date of filing of the last
comment on which to submit a response.

            /s/  Timothy C. Stanceu
            Timothy C. Stanceu
            Judge

Dated: August 26, 2021
       New York, New York